Good morning, Your Honors. It's my honor and on behalf of Dean McClough and Barry Jacobs. Your Honors, I'd like to actually focus mostly on the first and last arguments that were raised in my brief. I know I've got ten minutes and I'm going to try and use it as well as I can. I think it's fairly clear from the briefing that the most important issue in this is involving the deliberate misrepresentation of the divinity that happened during the petitioner's trial. And just to briefly explain, I know it's from the briefs, but essentially, Dr. Jacobs said that he had come downstairs, found his wife passed out on the kitchen floor, attempted to revive her, turned her over, called the 9-1-1. The police arrived approximately 17 minutes later. And then the issue is where was the location of Libidity because if Libidity was to her front, it would corroborate his story. If Libidity was to her back by the time the police arrived 17 minutes later, it would show he was lying. At trial, the prosecutor presented, well, there were two, back up a little bit just to the actual facts, there were two police officers who arrived around 20 minutes after that. One was Officer De La Cruz, the other was Officer Gluszewski. I think they arrived separately. They each did separate reports, but the only report that actually mentioned Libidity was actually De La Cruz's report that says it was to the front. I think it's to the front of the face, the arms, or whatever. But the only actual description of Libidity is to the front. And the court knows this is when people die, blood pools, that's why Libidity forms. Was De La Cruz's report or his testimony about it before the jury? No. No. That's, that Was there any evidence before the jury of Libidity? to the back. And that's the, that's the misrepresentation. In other words, De La Cruz was called. And De La Cruz was called by the prosecution. And as part of my ineffective assistance argument, he was not cross-examined or recalled on the issue of clarifying exactly where Libidity was. Trial defense counsel had the De La Cruz report? They did. They did. So there was no question that it was turned over. I actually received it from trial counsel. It's there. So it was never contested on that. But De La Cruz talks and says he was there, and he was actually talking to Dr. Jacobs, and that's the part of his testimony. But his actual report says Libidity is to the front. Gosefsky is then called and says that Libidity was to the calves. In other words, it was to the legs and to the calves, which is the back. And during, and then the prosecutor argued during the trial that, well, Libidity then became an issue. And the reason is because the argument is that if Libidity is to the back, by the time the police get there, he's lying. Libidity could not have formed within 20 minutes. And because defense counsel didn't catch this, there's a whole discussion throughout the trial about when Libidity can or cannot form. Now, as part of the ineffective assistance argument, if trial counsel had brought up the fact that it was to the front, that whole thing would have been done. It would have been end of story. But, in fact, that was yet another controversy on what turned out to be a misrepresentation. Now, just so it's clear in my mind, your client's version was that he came down and found her face down? Correct. And then flipped her over to try to revive her? Correct. Is there any testimony about how that would have affected Libidity? Well, we later presented in the court, I mean, in the habeas proceedings, because this was actually a trial. At trial, was there any evidence about what effect that could or would have had on Libidity? Being flipped over? Yes. No. The issue? Well, there was a discussion to the experts as to how fast Libidity would form. Because I don't think at trial there was the issue of fixed Libidity. In other words, when bodies are at rest for a certain period of time, like six to eight hours, it will fix and it won't move. But it was brought out how fast it could form. So it was argued from the fact that it had already formed if the police were there and it had formed to the back. He was lying because it would not have formed within 20 minutes. So that, I mean, the relevance became this way. If it was to the front, it would corroborate his story that he found her, he turned her over, and Libidity would still be at the front. It had not shifted. If it was to the back, within 20 minutes, he was lying. Because if it was to the back and he had said, I just found her, and 20 minutes later, and flips her over, and 20 minutes later they get there, Libidity could, that was the whole issue, was whether Libidity could or could not form within 20 minutes. And most experts, in fact, all of them said it couldn't. It was very unlikely it could form within an hour or an hour and a half. Now, according to Dela Cruz's report, it's absolutely consistent with what he says. I woke up, I found her passed out, I tried to flip her over. He does not know how long she's been there. He determines she's dead, he calls 911, and the police show up. This is not inadvertent. First, I think the Respondent has argued this is just sort of a difference of opinion. I don't think this is not a different way of looking at things. One is what happened. One is the actual description of how she was when he was there. And the other is a misrepresentation that causes the jury to think that when she gets, when they get there, that Libidity is to the back, and therefore he's lying. And the prosecution said in the sidebar, and I've included this in my further excerpts, this is what they wanted to show. This is specifically what they wanted to do. Now, again, as part of ineffective assistance, the trial counsel should have been aware of where they were going and nipped this in the butt. But it's clear from the actual contemporaneous report of the two people who were there, the only one that describes this, that she's presenting, the prosecutor is presenting, the one witness to give an impression that it's to the back when it's clearly to the front. Now, the reason this makes a difference is because, and by the time we … The prosecutor attributed her statement to the other policeman, did she not? Not Dela Cruz. She was … Dela Cruz never … Hmm? Well, Dela Cruz never really … She said the other, I've forgotten the name of the other person. Glazewski or Glazewski, or she was also called Reyes at one point because she got married. She was attributed her statement to that person. Glazewski's the one that came in and said, I found lividity and it was located to the back. But her report never says anything about it. The only, the actual description and … Well, that was a statement about the calves, wasn't it? Right. Right. So the calves and calves are at the back of the legs. And it was argued during the closing argument that this was basically showing a false exculpatory statement. It was saying one thing and it turns out it's different. Now, the reason, of course, we always have the fun question of standard of review in these cases. But I think basically at this one, it's not entitled to be objectively unreasonable standard. Why? Because the state court didn't even find it was a misrepresentation. What they said was it was less than accurate. But they did not say it was a misrepresentation and did not review it as a NAPU error. I thought my impression was that the state court said that it was not the major item of contention. Right. That the major item of contention was whether she had been choked. Right. The prosecution version. Correct. Or whether the marks on her throat it said were the result of Dr. Jacobs trying to revive her. Right. After she had choked on, after she had asphyxiated on food. Right. And that's really getting to my point, which is that materiality is the issue here. Whether, however it's viewed, because ultimately the district court found that it was a misrepresentation, but so what? Because they were saying there was just an absolutely overwhelming evidence of strangulation. Well, first, I think if you look at this trial, this really was a battle of the experts. There was evidence on both sides and there was evidence from experts on both sides that would have given the issue uncausation. So I think this, to say that it was overwhelming, well, yes, there was lots of evidence of strangulation. But there was lots of evidence that it was something else. So I don't know if it's overwhelming or whether it's just a lot. But the issue ultimately under a NAPU error is whether there's really any reasonable likelihood it would have made a difference. In this case, I think it does make a difference. And the reason why is because if you look at the nature of it, it is a battle of the experts. This is an unusual homicide case. Causation is almost never the issue. It's usually three gunshot wounds to the head or something like that. This is a much different kind of case. This was a different kind of animal for a general kind of homicide case. It was hotly contested. There were a lot of experts and the jury was out for a week. The reason why this would make a difference is that a jury could look at this and say, well, okay, one side says this, one side says that. We can't figure out really what's going on. But he's lying. Therefore, he's guilty. Because the effect is showing that he's trying to give a story. And it's not just he's lying because we think so. He's lying because there's this absolute physical evidence of lividity that shows that she couldn't have been in the state that he found her when he said so. Because when they got there, she looked different. So it's not just a fleeting little comment. This is the kind of thing where if it is a balanced case or even if it's not so balanced but they're still trying to figure out how to cut through it, this is the one that says, this is the one that decides it. So I think looking at it as a NAFU error and on the basis of that, it really is why this is why we're here and why the court erred. Let me just briefly, because I think the issue of it, well, I can't. I'm up. So go ahead. Well, I mean, the issue, I think the other issue is because one can look at this and say, well, okay, there really was overwhelming evidence. I think there's some areas in which I really deal with this and I think have to really discuss it in terms of the brief. The other is the issue of the misrepresentation to the bump of the head. I do not think that that is glaring and I don't think it's as blatant as the other. The issue is this. It's whether or not the description of the bump of the head was here or here. There were two bumps, weren't there? Well, actually, yes. But now if you look, and I think if you look at the supplemental excerpts, especially the supplemental excerpts volume four, these are huge excerpts of records. But anyway, if you look at volume four, and I think it was at 957 to 960, that pretty much is the version that the prosecution had, that there was, we're only talking about one bump, and the one bump is here. Now, if you look at my excerpt, I think it's my further excerpt, I don't have color pictures, but I think you can get the point, is on 21, there's an injury here as the scalp is flipped back. So the misrepresentation, I can't really say whether it was a deliberate misrepresentation or whether it was just sort of moving things around. I think if you look at it in the context, it was a deliberate misrepresentation, but whether it's this bump or this bump. If it's this bump, it's very difficult for me to explain. I mean, I have to say that is, she's hit on the head because how else are you going to get by falling? But if it's this bump, and this is the one that was initially described, I think it's two and a half, two and a half, or two, three and a quarter inches to the side and two inches to the back, which really corresponds to this, it's called a hatband injury. And a hatband injury, if someone passes out, they can hit like this. But the prosecutor argued because the only bump was here, that's an absurd version. She would have had to literally dive over and land on her head. Did the prosecutor use the word only? Did the prosecutor use the word only? Only as to one bump? Yeah. I can't say whether or not she... The answer to that is no, isn't it? Well, I... She referred to a bump on the head and said how could this happen given its placement. But she didn't say only. This would be the only way to get it? No. She didn't say that was the only bump. No, she didn't. Well, there's only, okay, I have to say, I cannot say this is the only bump. But the only discussion of a bump that was brought up by the prosecutor was that. It was presented as if there was only one bump. And, well, and so, but the issue is even, okay, I'm seeing your lesson persuaded. But even if you look at it and say it's not a deliberate misrepresentation, it's not overwhelming evidence. It can still be viewed by this Court then as evidence to show that there was two ways in which it could happen. Because it is, I mean, it's not a material issue if absolutely there's unrebutted evidence that shows that there's no other way she could have died. So I think if you look at it... The prosecutor made that argument. Did the defense attorney get up in front of the jury and describe the hat band bump? He actually didn't bring out the issue in front of the cross-examination of their experts. I asked you about argument, not cross-examination. Yes, I think he did. Yes. All right. Yes, it was discussed, and that issue was brought up. Wasn't there an exhibit where these bumps were diagrammed? Well, the only exhibits that really show it are the ones that are included in Volume 4 of the supplemental excerpts. And those are the ones that were presented by the prosecution, and those are the ones that show that it's at the top of the head. It's not here and here. It's just here. And the reason, and I think it's also included in the supplemental excerpts, what was the actual, that explanation for that bump was, as we later brought out and put in declarations in the habeas, that this was actually caused by a dermatitis issue or injury. And if you look at it, that's not a bump. That's like a rash. It's different than what's here. The point is, I don't want to go down particularly and argue whether it's a deliberate misrepresentation or not. But I think it is important to see that at least if you look at this, it's, again, not overwhelming evidence of guilt. And the reason why I discuss this also in the ineffective assistance. You talk about prosecutorial misconduct as well. Do you not? Right. Do you want to say anything about that? Well, the issue, I mean, I think generally. You need to come to the point because you kind of repeat yourself. Well, I mean, if we get over the hump and it's enough of an error, I don't have to. Yeah, but I'm asking you a question. Just answer it. Well, I do think one looks at the totality of the conduct in this case. I mean, there was clearly one that was found to be a deliberate misrepresentation. Another that I think is, if you look at it, it looks like a fludging of the facts, whether one can say it's pushing the envelope or not. But then throughout it, there was the impugning the motives of the defense counsel, which even though they're, I mean, those are overruled and saying essentially that they're trying to somehow load their experts and pay their experts and that's their agenda. Those were overruled and that was improper. And then the other one was that they were, she was, the prosecutor was referring to evidence that had been excluded. And even though that's sustained, it's again saying, well, here it is, here it is, here it is. So I think, I mean, looking at it as a Darden v. Wainwright issue, I mean, NAPU obviously I get more mileage on. But if you look at the whole context, the way that this was presented, it really was at every point misconduct and really kind of either crossing the line or pushing it in a way that was improper. I think I'm out of it.  Ms. Jacobson. Good morning. May it please the Court. Lisa Jacobson, Deputy Attorney General for the Respondent. First, with respect to the lividity evidence, there was no false evidence presented. The female officer testified that she saw lividity on the lower part of Nadine's leg and Nadine's calf, and Nadine was lying on the floor on her back. I think the point that your opponent is raising is whether it was ineffective assistance of counsel for trial defense counsel not to have brought out Delacruz's report about frontal lividity and not to have cross-examined any of the witnesses on that issue. What's your response to that? No, for two reasons. First, as all the courts have found, there was no prejudice from counsel's failure to elicit this testimony. And this is because of the law. I mean, this is a case where one version is that Dr. Jacobs strangled his wife to death. That's the State's position. Correct. The defense was I found my wife passed out, what I thought was passed out, face down. I turned her over. I tried to revive her and failed. And 911 and the police officers came, one of whom was Delacruz, right? Yes. Whose report says there was frontal lividity, right? Yes. Which would have been consistent with what Dr. Jacobs' position was, right? Yes. How can that not be material? Well How could that not have produced prejudice? Because the backbone of the prosecution's case was the medical evidence. And the testimony of the prosecution's experts that Nadine was strangled to death was not contingent on lividity at all. Were they asked about lividity? They were asked in general, like how quickly it takes lividity to form. Were they asked specifically about frontal lividity? No. They were just asked. Were either of them confronted on cross-examination with the fact that one of the initial officers to the scene found frontal lividity? No, Your Honor. Okay. But lividity was not. Did the prosecution bring that out at all? The frontal lividity? Yes. No, Your Honor. She only cross-examined the female officer about her observations. And the But the prosecution's experts, their opinions were based on the Nadine's injuries, which were the bruising on the neck, the petechiae on the eyes and the on the neck, and the fractures to the cricoid and the contusion on the back of the head. All of these injuries, the expert testifies, were inconsistent with resuscitation and or with Nadine trying to struggle to free the pastry from her mouth. There was pastry in her soft pastry in her throat, wasn't there? Not in her throat. It was a third-a-cup packed in her mouth. Okay. And that leads kind of to the next point, that, yes, the prosecutor used the presence of the lividity to impeach Jacob's statement to the police. But this was only one of several factors that the prosecutor pointed to. Others included Jacob's statement that he cleared Nadine's mouth and throat to resuscitate her, yet there was still this third-a-cup of pastry in her mouth. One of the experts, forensic experts, testified at the preliminary hearing, correct? Correct. And offered testimony that choking or strangulation, choking of the type that Dr. Jacobs was suggesting happened to his wife could not have occurred by the result of the presence of the soft material in the throat. Do I have that roughly right? Correct. He didn't believe that Nadine choked on soft pastry. Okay. After the preliminary hearing, the prosecutor showed that expert witness one or more learned treatises or articles that said just to the contrary, right? The article, well, there's a med search that shows that the expert looked at that in between the prelim and trial, and that that article said that 75 percent of free-roaming adults choke on meat and that 60 percent of institutionalized patients choke on soft  So it can happen. It can happen. That was the point. Yes. Was the fact that the prosecutor showed this expert that material ever disclosed to the defense? Your Honor, I don't. The answer is no, isn't it? It appears from the record, no, because it came out. But I'm not sure that it was the prosecutor. And the State court concluded that that was not a Brady violation, correct? Because it was not exculpatory. And that's wrong, isn't it? I don't think that. That legal conclusion is wrong. Don't the cases all over the board say that impeachment evidence can be Brady evidence? I think the impeachment value of that evidence is somewhat tenuous, given the nature of or the content of the article and the basis. What difference does that make? Your approach does that make, whether it's tenuous or not? There's a duty to disclose. There is a duty to disclose. And even if we assume that. And it was not disclosed. It was not disclosed. Yes. But I'm not, you know, it doesn't make a difference whether the prosecutor was aware of it or not, because I'm not sure that she was. But even assuming. Are you saying? Correct me if I'm wrong now. Expert testifies to the preliminary hearing. After the hearing, the prosecutor, the woman who tried the case, which I take it was not you. Yes. Finds these articles and shows them to the expert. Do I have that right so far? Well, my. What I saw in the record, Your Honor, was that they submitted as an exhibit to support the Brady claim was a copy of a MedSearch document that showed articles that Dr. Swalwell looked about. Oh, I see. Prior to trial, the defense brought this up? This came out after I think the appeal was final and there was a civil case, and they asked for discovery of all the stuff that Dr. Swalwell looked at. So can we tell one way or the other from the record whether the prosecutor knew about this information? I could. I was not able to tell. But it did exist. It did exist. There's a footnote in the petition filed in the court of appeal where counsel pointed out that the prosecutor had asked for a like discovery, but there's no mention that I saw in that petition that the prosecutor actually knew about it. Does the prosecutor have to be aware? No. If it's part of assuming that the medical examiner is part of the law enforcement team. But we don't have to make that decision here or even if you disagree with me about whether or not this is impeachment, because it was not material for the reasons set forth in the brief and by the various courts, namely that the defense had these articles. They brought the content out of these articles through Dr. Schwartz, and the evidence really was overwhelming. Would you have disclosed it? Yes. Okay. But I think our office, we tend to disclose error on the side of caution. Good for you. Good for you. With respect to the lividity, though, it really was not relevant to the opinions of the medical experts, the prosecution's medical experts. They didn't consider lividity at all. And the prosecutor's statement about it was just isolated in a lengthy closing argument. And the jurors were instructed that the statements of counsel are not evidence in that evidence of consciousness of guilt alone. Was there some discussion in the trial about whether this lividity could have shifted in the 17 minutes that were available? My recollection is that there was some discussion about the shifting at some point about that lividity can shift. And Dr. Schwartz testified that lividity can occur within 15 to 20 minutes. And in preparing for argument, I thought of, although you can decide the ineffective assistance claim based on lack of prejudice alone, in thinking about why counsel might not have elicited the frontal lividity evidence, it dawned on me that that evidence in a sense cuts both ways. The defense, it was consistent in a sense with Jacob's statement that he found his wife on the floor, flipped her over, and tried to resuscitate her. But lividity on the back side was more favorable to the overall defense theory that the injuries to the neck were caused by, particularly the bruising to the neck, were caused by Jacob's resuscitation efforts because there was expert testimony that dead people don't bruise or bleed. And so if Nadine were dead long enough for lividity to form on the front side, it would undercut the theory that he caused the injuries on her neck. But again, you can resolve a Strickland claim based on lack of prejudice alone. What did Dr. Jacobs tell the police about her condition when he found her? Was it his position that she was, she had expired when he found her? Yes. Yes. So I think counsel, defense counsel was kind of in a rock between a rock and a hard place. Did he testify at the trial?  No, Your Honor. But counsel had to deal with both the statements Jacobs made and come up with some explanation for the injuries. And that may be one reason why he focused on when lividity can form as opposed to the location of lividity. And the medical testimony about cause of death at the trial from the two experts put on the, by the prosecution was to the effect that the cause of death was strangulation and it could not have been from an attempt to revive her. Yes, Your Honor. Okay. And Mr. Squall. What was the state's position on the, with regard to the material in her mouth which Jacobs said she choked on? Was there a position that this was set up by Jacobs, that he put the stuff in her mouth? Yes. Or that she actually had something in her mouth and he just described the homicide to that? The prosecution's theory was that he staged the scene. That he set it up that way? Yes. Okay. Because that's not very clear in the briefs. I don't think anybody ever mentions that. Well, I regret I didn't do that then. I think the injuries to the head, it's pretty clear in the record and the exhibits and the diagrams that there was no misrepresentation or false evidence in that regard. I take it she didn't say only. No, Your Honor. In fact, they elicited testimony about both injuries and both this, the one on the back of the head, which their expert agreed was on the back, on the top part of the head, the external and internal view of the injuries, and then this one on the side. And the standard of review is under AEDPA? Yes, Your Honor. Okay. Wouldn't that have been pretty quick thinking to find your wife or strangle your wife and then go out and get some soft food to put in her mouth and claim she choked on it? Yes. I think the defendant, Appellant, is an intelligent man, but it didn't work. It worked at first because when they first started the autopsy, it was considered an accidental choking. But once Dr. Swalwell saw the petechiae on the eyelids and eye lining and neck and the contusion on the back of the head, he called the police in. So unless this Court has any additional questions for me, we'd ask that this Court affirm the District Court's opinion. Thank you very much. We'll give you one minute for rebuttal. I do know the unabridged issue about how the memo with Swalwell came out. Essentially, after Dr. Jacobs had been convicted, whether it was as a result of a civil case or not, I think he actually contacted Swalwell himself. And he got from Swalwell the fact that he had on his own looked at those records. I have to say there's nothing in the record that shows that the prosecutor actually showed those to her. There is indications in the memo that the prosecutor was contacting another person in the medical examiner's office on the subject of lividity initially fairly quickly. And those, I didn't include them in the excerpts. I think they were part of it. But on the issue on that particular, on the cafe coronary and that article, it was Swalwell who did it. It does not look as though the prosecutor somehow fed them or showed them the articles. On the issue on the choking of the food, there was testimony that actually when they got there, they found food in her mouth and also a glob of what looked like wet food on the side. That would have been consistent with Dr. Jacobson's claim that he had tried to clear the food from her mouth before he had tried to resuscitate her. And there was also a subject that was brought out, whether or not there was food either in the epiglottis or whether it was in the bronchial tree. And I think even Dr. Swalwell said yes, he did see minute particles of food actually in the bronchial tree so that if that was staged, it was very, very effectively staged. That's all I have to say. Thank you. Thank you. The matter will stand submitted. I'll call the next matter. And Lugo versus Valverde. Thank you.
judges: Pregerson, Hawkins, Cudahy